UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DENISE MONARQUE,
as personal representative of the estate
of Richard Monarque, deceased

       Plaintiff,

      v.                           No. 1:11-cv-00135-MV-KBM

THE CITY OF RIO RANCHO, RIO
RANCHO POLICE DEPARTMENT,
JUSTIN GARCIA, LEROY
MALDONADO, MONTE JONES, and
ROBERT BOONE,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**This matter** comes before the Court on Defendants' *Motion for Summary Judgment Based on Qualified Immunity, Dismissal of All Remaining Claims, and Request for Stay* (Doc. 9). In an action filed pursuant to 42 U.S.C. § 1983, Plaintiff Denise Monarque, acting as the personal representative of her deceased brother, Richard Monarque, brings counts against the individual Defendants, officers of the Rio Rancho Police Department ("RRPD"), for either excessive force or supervisory liability. Plaintiff also asserts claims against all Defendants under the New Mexico Tort Claims Act and the Rehabilitation Act of 1973. On the instant motion, Defendants contend that they are entitled to qualified immunity on Plaintiff's constitutional claims and that the remainder of her claims are subject to dismissal. The Court, having considered the motion, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that Defendants' motion should be **GRANTED in part** and **DENIED in part.**

## FACTUAL BACKGROUND[1]

On January 15, 2009, at 6:15 p.m., the RRPD received a 911 call reporting suspicious

activity in the vicinity of 1031 Meadowlark Court in the city of Rio Rancho ("the City").  The

caller described an unidentified male subject "running around in the street . . . unknown what is

wrong with him."  (Doc. 12 Ex. 1).  The RRPD received a second 911 call at 6:19 p.m., which

reported a male subject "banging on apartments yelling for help" and running around  in circles.

*Id.*  The caller opined that the subject was either under the influence of drugs or experiencing a

medical emergency.

Sergeant Monte Jones and Officers Justin Garcia and Leroy Maldonado were all

dispatched to the scene, arriving between 6:22 p.m. and 6:25 p.m.  Officer Garcia was the first to

identify a man matching the 911 callers' descriptions – later identified as Richard Monarque –

while driving up to the scene.  Garcia activated his emergency overhead lights and trained his

spotlight on Mr. Monarque.  He then alighted from his vehicle and made verbal contact with

him.  Officer Maldonado also approached Mr. Monarque and attempted to make contact with

him.

Mr. Monarque walked toward the officers in what appeared to them to be a hallucinatory

state, muttering that dogs were attacking him and that someone should "get them off [him]."  *Id.*

Ex. 3.  The officers observed that Mr. Monarque was sweating profusely and that he appeared to

be either under the influence of a narcotic or suffering from a psychological disturbance.  Officer

Garcia's police report noted that there were numerous bystanders to the situation, including

---

[1]Many of the facts set forth herein are undisputed.  Where there is a dispute, the Court
accepts the version of events alleged by Plaintiff, as is appropriate on Defendants' motion for
summary judgment.  *See infra* at 5-6.

small children.

Officers Garcia and Maldonado verbally commanded Mr. Monarque to sit down on the curb, who instead began to walk away from them.  The two officers then each took him by an arm in an effort to make him sit down.  However, Mr. Monarque continued to struggle and call out that dogs were jumping on his back and attacking him.  Sergeant Jones, who had by then arrived on the scene, advised the officers to get Mr. Monarque on the ground and handcuff him. The process did not go smoothly, and it took three men – Garcia, Maldonado, and a third officer, Andrew Waldrep. who is not a party to the instant suit – to restrain him.  Mr. Monarque was then forced down on the sidewalk while handcuffed.

After his handcuffing, Mr. Monarque quieted and became compliant.  He was placed in a seated position on the curb in handcuffs.  Mr. Monarque did not have any visible injuries on his person at this time.

At some point shortly after, the officers decided to place Mr. Monarque in a patrol car. However, once they picked him up off the ground and began to move him in the direction of the car, he resumed crying out that dogs were attacking him and physically resisted the officers' attempts to place him inside the car.

Sergeant Jones then ordered Officer Waldrep to leave the immediate area and conduct a search for Mr. Monarque's vehicle, while Garcia and Maldonado were ordered to take Mr. Monarque "to a flat parking lot a few feet away and lay him on the ground" in a face-down position.  (Doc. 12 Ex. 7).  The officers complied, forcibly placing Mr. Monarque face-down on his stomach in the parking lot.  Jones then radioed for an ambulance.

Once Mr. Monarque was face-down on the ground, Garcia "controlled his legs by crossing his ankles and putting some weight [on Monarque] towards the ground," (Doc. 13 Ex.

3), while Maldonado restrained his upper body.  The two officers were observed by a witness to "[get] on top of [Monarque] [and] then were waiting for something."  (Doc. 12 Ex. 9).  Jones instructed Maldonado to monitor Mr. Monarque's breathing and Maldonado reported that he was breathing normally.  The officers kept Mr. Monarque in this position for a period of approximately two to three minutes.

At some point, Garcia noticed that Mr. Monarque's chest was not expanding and his legs had gone limp.  He and Maldonado turned Mr. Monarque over on his back, and were unable to find a pulse at his carotid artery.  The officers began performing CPR.  Sergeant Jones radioed EMS for the second time at 6:33 p.m., and advised them that Mr. Monarque had stopped breathing.  The ambulance initially drove past the scene, but arrived at 6:35 p.m.

The EMS crew took over efforts to revive Mr. Monarque at the scene and continued them as he was transported to Presbyterian hospital.  Garcia accompanied the ambulance to the hospital, where Mr. Monarque was pronounced dead at 7:09 p.m.

An autopsy was performed, and on April 16, 2009, the Office of the Medical Investigator at the University of New Mexico issued its Report of Findings.  The OMI report gave Mr. Monarque's cause of death as "positional asphyxia during physical restraining."[2]  (Doc. 12 Ex. 5 at 3).  The report further described evidence of injury to Mr. Monarque's person including various blunt force injuries to the head; an abrasion on the left lower abdominal quadrant; several abrasions on both arms; and multiple abrasions on both knees.

_____

[2]While Defendants state in their brief on the instant motion that the OMI report "listed the causes of death as excited delirium (drug use) <u>and</u> positional asphyxia," (Doc. 9 at 2) (emphasis added), the excerpt from the report submitted by Plaintiff cites only positional asphyxia.  The complete report is not in the summary judgment record.

4

## RELEVANT PROCEDURAL HISTORY

On January 14, 2011, Plaintiff filed the instant action in state court, asserting claims against Sergeant Jones, Officer Garcia, and Officer Maldonado; the Chief of the RRPD, Robert Boone; and two governmental entities, the City and the RRPD.  On February 11, 2011, Defendants removed the case to this Court.

On March 2, 2011, Defendants filed the instant motion for summary judgment, which included a request for a blanket stay of discovery pending resolution of their argument that certain Defendants were entitled to qualified immunity on Plaintiff's constitutional claims.  The motion was fully briefed as of March 30, 2011.

On May 20, 2011, Judge Karen B. Molzen, the U.S. Magistrate Judge assigned to the case, entered an order staying discovery, pending the Court's resolution of the instant motion.

## LEGAL STANDARD

### Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be rendered "where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party to show that there is a genuine issue of material fact.  The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's

5

favor." *Id.  See also Clifton v. Craig*, 924 F.2d 182, 183 (10ᵗʰ Cir. 1993).  It is not enough for the

nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New*

*Mexico Taxation and Rev. Dept*., No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M.,

Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation") (internal quotation and marks

omitted).  In reviewing a motion for summary judgment, the court must "examine the factual

record and draw reasonable inferences therefrom in the light most favorable to the nonmoving

party."  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10ᵗʰ Cir.

2010).  Its function at this stage is "not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 243.


**Qualified Immunity**

Because a successful qualified immunity defense "generally shields from liability for

civil damages government officials performing discretionary functions . . .  insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known," special standards apply to the assessment of a summary

judgment motion raising this defense. *Gomes v. Wood*, 451 F.3d 1122, 1134 (10ᵗʰ Cir. 2006)

(quotation omitted); *see also Hinton v. City of Elwood*, 997 F. 2d 774, 779 (10ᵗʰ Cir. 1993).

In analyzing a qualified immunity defense, this Court undertakes a three-part inquiry.

First, the Court must determine whether the plaintiff 's allegations, if true, establish a violation

of the plaintiff's constitutional rights.  *Id.*  Second, if the allegations meet that standard and the

analysis continues, the Court must determine "whether the law was clearly established at the

6

time the alleged violations occurred."  *Roska v. Peterson,* 328 F.3d 1230, 1247 (10th Cir. 2003).

A law is deemed clearly established "if a reasonable official in the defendant's circumstances

would understand that her conduct violated the plaintiff's constitutional right."  *Gomes*, 451 F.3d

at 1134.  The Tenth Circuit has provided the additional guidance that, under ordinary

circumstances, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly

established weight of authority from other courts must have found the law to be as the plaintiff

maintains," *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 516 (10th Cir. 1998), in order

for a plaintiff to demonstrate that the law was clearly established.  If the plaintiff shows that the

law is clearly established, the third and final part of the inquiry requires the Court to consider

whether, "extraordinary circumstances – such as reliance on the advice of counsel or on a statute

– so prevented the official from knowing that her actions were unconstitutional that she should

not be imputed with knowledge of a clearly established right."  *Gomes*, 451 F.3d at 1134

(internal quotation and marks omitted).


**DISCUSSION**

I.      **Plaintiff's Constitutional Claim Against Garcia, Maldonado, and Jones (42 U.S.C. §
        1983)**

        While the heading of Plaintiff's Count I does not specify the constitutional violation she

means to assert against Sergeant Jones and Officers Garcia and Maldonado, the relevant section

of the Complaint alleges that the officers' conduct violated Mr. Monarque's Fourth Amendment

rights "to be free from unreasonable and illegal seizures of the person, as well as to be free from

the application of unreasonable and excessive force."  (Doc. 4 Ex.1, Cplt. ¶ 63).  However,

Plaintiff makes no mention of an unreasonable seizure claim anywhere in her briefing on the

instant motion.  Rather, she argues only that the force employed by Garcia and Maldonado at the direction of Jones was constitutionally excessive.  Therefore, to the extent that Plaintiff has asserted a claim for unreasonable seizure in the Complaint, the Court considers such claim abandoned.

On the instant motion, Defendants argue that the officers' use of certain positional restraint techniques on Mr. Monarque was undertaken pursuant to their "community caretaking functions," for Mr. Monarque's own safety and that of his community.  (Doc. 9 at 10). Consequently, Defendants contend that the officers' conduct should be analyzed under a more relaxed standard than the "objective reasonableness" standard typically applied to claims of excessive force.  However, Defendants also maintain that even if the officers' conduct is analyzed under the "objective reasonableness" standard, they are nevertheless entitled to qualified immunity, because Plaintiff cannot establish the violation of a Fourth Amendment right.

### A.  Defendants' "Community Caretaking" Argument

Defendants note that courts have long recognized that law enforcement officers "may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" (Doc. 9 at 10, quoting *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)).  Defendants then set forth the legal framework the Tenth Circuit applied in *King* – which analyzed an officer's "seizure of the person" at a traffic stop under the "reasonable suspicion" standard set forth by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1967) – in an apparent suggestion that this Court likewise apply the "reasonable suspicion" test to the officers' use of positional restraint techniques on Mr. Monarque.  Defendants further liken

8

this case to *Gallegos v. City of Colo. Springs*, 114 F.3d 1024 (10th Cir. 1997), in which the Tenth Circuit applied the "reasonable suspicion" standard in determining that police officers' seconds-long restraint of a distraught, combative plaintiff was not an unreasonable seizure of the plaintiff's person.

The Court finds *King, Gallegos,* and the "reasonable suspicion" standard inapposite to the instant claim.  While the officer in *King* was acting in a noninvestigatory capacity and "clearly exercising her 'community caretaking function'" when she approached the plaintiff, the resulting encounter amounted to "the incremental intrusion of [plaintiff's] being required to listen to [the officer] while stuck in traffic," and thus did not constitute an unreasonable seizure of the plaintiff's person.  990 F.2d at 1561; *see also id.* at 1557 (noting that *Terry* "created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty").  While *Gallegos* has certain factual similarities to the instant case – though there are crucial differences, as well – it too involved a claim for unreasonable seizure, not a claim for excessive force, to which the "reasonable suspicion" standard does not apply. Regardless of whether the officers suspected Mr. Monarque of criminal activity or were simply acting out of a desire to protect him and others when they initiated the take-down procedure, Plaintiff's claim is that they subsequently committed excessive force which resulted in his asphyxiation and death.  Thus, the "reasonable suspicion" standard does not apply to Plaintiff's "excessive force" claim.

**B.  Whether Officers' Use of Force Was Constitutionally Excessive**

"[B]ecause the Fourth Amendment . . . pertains to the events leading up to and including an arrest of a citizen previously at liberty, excessive force claims arising during this period are generally reviewed under a relatively exacting 'objective reasonableness' standard." *Porro v.*

9

*Barnes,* 624 F.3d 1322, 1325 (10th Cir. 2010).  "The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Reasonableness is evaluated under a totality of the circumstances approach which requires the Court to consider three, non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).  Moreover, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham,* 490 U.S. at 396.

"Where an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003) (marks omitted).  Here, Plaintiff contends that Mr. Monarque posed no threat of serious harm to Jones, Garcia, and Maldonado, whose use of deadly force in his detention resulted in his death by positional asphyxia.  She asserts that Mr. Monarque had already been handcuffed at the time the challenged force was applied, so that he was not a threat to the officers or any bystanders; that he had been sitting calmly on the curb until the officers' attempts to forcibly place him in their patrol car reignited his hallucination that dogs were attacking him; and that "the encounter posed so little threat to the officers that Officer Waldrep had earlier left the scene" at the direction of Sergeant Jones.  (Doc. 12 at 9).

Defendants do not argue that Mr. Monarque posed a threat of serious physical harm at the time of the challenged conduct.  Rather, they contend that the evidence shows that he "was

restrained with minimal force," (Doc. 9 at 11), by officers who did not strike, "use batons[,] or beat him. They tried to control him using hands, arms, and legs." *Id.* at 14. Defendants further maintain that, should this case proceed to trial, "the claim that Mr. Monarque's death was attributable to positional asphyxia would be greatly in dispute." *Id.* at 2. Thus, Defendants by their own admission concede that a genuine dispute of material fact exists as to whether the officers' actions were objectively reasonable.

Taking the factual record in the light most favorable to Plaintiff, as it must, the Court finds that Plaintiff puts forth evidence that gives rise to a jury question regarding whether the officers' actions were reasonable. First, there is evidence that a reasonable officer on the scene would have known that placing pressure on Mr. Monarque's upper body as he lay face-down on his stomach put him at significant risk of asphyxiation. In finding the existence of a jury question as to whether officers acted reasonably in applying pressure to an arrestee's upper back as he lay on his stomach, the Tenth Circuit held in *Weigel v. Broad,* 544 F.3d 1143, 1152 (10th Cir. 2008), that the arrestee's "apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation." *See also Cruz v. City of Laramie,* 239 F.3d 1183, 1189 (10th Cir. 2001) (reviewing both case law and training materials available to police officers which noted "the breathing problems created by pressure on the back and placement in a prone position, especially when an individual is in a state of 'excited delirium,'" and finding them evidence that trained officer should have known that applying pressure to chest of individual apparently experiencing diminished capacity was likely to cause positional asphyxia).

Plaintiff points to the OMI report as evidence that Mr. Monarque's death was the result of positional asphyxia suffered while being restrained face-down by Officers Garcia and

Maldonado.  There is also evidence that the officers knew Mr. Monarque to be in a state of excited delirium, as he was struggling vigorously and appeared to be hallucinating while either under the influence of narcotics or suffering from a natural psychological condition at the time they employed the challenged restraint technique.  Thus, the Court finds that a reasonable jury could conclude that it would have been clear to a reasonable officer "that the pressure applied to [Mr. Monarque's] upper torso would suffice to cause his suffocation" in his alleged condition. *Weigel,* 544 F.3d at 1152.

Moreover, there is evidence that Mr. Monarque was subjected to such pressure for significantly longer than was necessary to restrain him.  By Defendants' own account, Mr. Monarque quieted and became compliant after he was handcuffed, but began to struggle again after they attempted to place him in a patrol car.  Defendants do not, however, claim that a handcuffed Mr. Monarque would still have posed a threat to the officers, the public, or himself unless he was maintained on his stomach with pressure applied to his upper back for up to three minutes.  *See* Doc. 9 Ex. A (Sergeant Jones stating in his police report that he instructed Garcia and Maldonado to "control" Mr. Monarque's torso and legs in face-down position and noticed "[a]fter approx[imately] two or three minutes" that Monarque was unresponsive and had stopped breathing).

In sum, Plaintiff has set forth evidence that, if believed, demonstrates that for a period of two to three minutes, Jones, Garcia, and Maldonado subjected Mr. Monarque to force that a reasonable officer would have known put him at significant risk of asphyxiation, at a time when he was already restrained and did not pose a risk of serious physical harm.  This constitutes a use of excessive force in violation of the Fourth Amendment.

### C.  Whether the Law Was Clearly Established

The second burden Plaintiff must meet in order to withstand the officers' assertion of

qualified immunity is to demonstrate that the right she has asserted was clearly established at the

time of the alleged violation.

> Ordinarily, in order for the law to be clearly established, there must be a Supreme
> Court or Tenth Circuit decision on point, or the clearly established weight of
> authority from other courts must have found the law to be as the plaintiff
> maintains.  The plaintiff is not required to show, however, that the very act in
> question previously was held unlawful in order to establish an absence of
> qualified immunity.

*Weigel*, 544 F.3d at 1153, quoting *Cruz*, 239 F.3d at 1187.

The Court finds the Tenth Circuit's decision in *Weigel* to be directly on point.  *Weigel*

involved a claim that law enforcement officers committed excessive force in subjecting a visibly

intoxicated, disoriented individual to a sustained application of pressure to his upper body and

legs as he lay face-down and handcuffed.  In that case, as here, the restraint allegedly continued

for a period of two to three minutes, until Weigel was determined to have stopped breathing.

*Weigel,* 544 F.3d at 1148.  The officers' subsequent attempts to resuscitate Weigel proved

unsuccessful; and the autopsy gave his cause of death as positional asphyxiation.  *Id.* at 1149-50.

In denying qualified immunity to the officers on plaintiff's "excessive force" claim, the

Tenth Circuit cited the absence of evidence that Weigel – having been handcuffed, though still

struggling  – posed a threat of serious physical harm at the time of the alleged deadly force.  *Id.*

at 1152.  The court further found that a reasonable officer would have known that Weigel's

"apparent intoxication, bizarre behavior, and vigorous struggle" placed him at serious risk of

asphyxiation when placed on his stomach with pressure applied to his upper back.  *Id.*  It

likewise noted the evidence that "Weigel was subjected to such pressure for a significant period

13

after it was clear that the pressure was unnecessary to restrain him. . . . There is [ ] evidence that Mr. Weigel was maintained in that position for about three minutes." *Id.* at 1152-53.

Defendants contend that "[t]he complete lack of evidence that any officer knelt, sat or pushed down on Mr. Monarque's upper back or torso at any time is the critical distinction between this case and *Weigel*." (Doc. 18 at 5). The Court disagrees. In fact, Plaintiff has set forth evidence that Officer Maldonado was, in some fashion, "on top" of Mr. Monarque's upper body for a period of two to three minutes. (Doc. 12 Ex. 9 ). The Court concludes that if a jury believes Plaintiff's version of events, the officers violated the constitution in a manner that was clearly established by the analogous case of *Weigel.*

### D.  Whether Knowledge of Illegality Should Be Imputed to the Officers

The final part of the Court's inquiry into whether the officers are entitled to qualified immunity requires it consider whether "extraordinary circumstances – such as reliance on the advice of counsel or on a statute" prevented them from knowing that their actions violated a clearly established constitutional right. *Gomes*, 451 F.3d at 1134; *see also supra* at 12. Because Defendants do not argue that any such circumstances exist, the Court will deny their motion for summary judgment as to Plaintiff's Fourth Amendment "excessive force" claim against Jones, Garcia, and Maldonado.

### II.  Plaintiff's Supervisory Liability Claim Against Boone (42 U.S.C. § 1983)

Plaintiff asserts a supervisory liability claim under § 1983 against Defendant Robert Boone, Chief of the Rio Rancho Police Department, arguing that he is liable for the officers' unconstitutional conduct in both his individual and official capacities. The Court will undertake to analyze both possibilities in turn.

14

## A. Individual Capacity

Plaintiff does not set forth any facts showing that Boone was personally involved in any way in the challenged use of positional restraints on Mr. Monarque, but suggests that Boone is nevertheless liable under § 1983 for failure to exercise due care in the training and supervision of the officers under his command.  The law is clear that Plaintiff may not maintain a § 1983 individual-capacity action against Boone on such a theory.  As the Supreme Court explained in *Ashcroft v. Iqbal*, "[i]n a 1983 suit . . . the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Iqbal*, 129 S. Ct. 1937, 1949 (2009).  As the Tenth Circuit explained in *Porro*,

> Just as § 1983's plain language doesn't authorize strict liability, it doesn't authorize respondeat superior liability.  The plain language of the statute . . . asks simply whether the defendant at issue '*subjected, or caused to be subjected*' a plaintiff to a deprivation of his legal rights.  To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights.

*Porro*, 624 F.3d at 1327 (rejecting §1983 liability for defendant sheriff where no evidence of sheriff's direct personal responsibility for plaintiff's tasing by junior officer) (internal quotation and brackets omitted).  *See also Brocks v. Bd. of Cty. Comm'rs of Sedgwick Cty., Kansas,* 329 Fed. Appx. 200, 202 (10th Cir. 2009) ("In an individual capacity suit, § 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation.") (internal quotation omitted).  In the absence of any evidence that Boone personally committed a deliberate, intentional act to violate Mr. Monarque's rights, the Court concludes that there is no genuine issue of material fact that Boone is not liable in his individual capacity under § 1983.

**B.  Official Capacity**

Plaintiff contends, without citing any authority, that Boone may be held liable in his official capacity under § 1983 "for the actions of [his] subordinates.  In order to prevail on a claim against a supervisor, a plaintiff must . . . show that the supervisor's subordinates violated the constitution."  (Doc. 12 at 18).  On the contrary, Boone cannot be held liable in his official capacity simply because an employee violated Mr. Monarque's constitutional rights.  *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997) (rejecting *respondeat superior* liability).  "Rather, [he] can be held liable only for establishing a 'policy' or custom' that was the 'moving force' behind [Mr. Monarque's] injuries."  *Id.* at 403-04 (internal quotation marks omitted).  Here, Plaintiff has failed to allege – let alone set forth evidence – that the RRPD had an established custom of violating the rights of detainees who appear mentally unstable or under the influence of narcotics.

Furthermore, the Tenth Circuit has held that an official-capacity §1983 claim based on an alleged failure to train employees "can be successful only if the inaction resulted from 'deliberate indifference' to the plaintiff's rights, as opposed to mere negligence."  *Brocks,* 329 Fed. Appx. at 202.  However, "[o]ne cannot be deliberately indifferent without some knowledge of the alleged situation."  Plaintiffs have not alleged that Boone knew of Mr. Monarque's arrest at any point prior to or during the encounter.  Because there is nothing in the record to suggest that Boone gave any advance approval to Garcia's and Maldonado's handling of Mr. Monarque, the Court finds that Boone is entitled to summary judgment on Plaintiff's § 1983 claim.  *See Porro*, 624 F.3d at 1327 (allegation of a sheriff's advance knowledge of the alleged constitutional violations of his subordinate, when "based on innuendo and speculation rather than fact," was insufficient to withstand summary judgment based on qualified immunity).

16

**III.     Plaintiff's Claims Under the New Mexico Tort Claims Act ("NMTCA")**

Plaintiff sets forth counts against all Defendants under the New Mexico Tort Claims Act,

N.M. Stat. Ann. 1978, §§ 41-4-1 to - 27 ("NMTCA") .  The NMTCA provides that a law

enforcement officer acting within the scope of his duty is immune from liability for tort except

for the following offenses:

> personal injury, bodily injury, wrongful death or property damage resulting from
> assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of
> process, libel, slander, defamation of character, violation of property rights or
> deprivation of any rights, privileges or immunities secured by the constitution and
> laws of the United States or New Mexico when caused by law enforcement
> officers while acting within the scope of their duties.

*Id*. § 41-4-12  (2011).  Plaintiff's brief recites that Sergeant Jones and Officers Garcia and

Maldonado are liable under the NMTCA because they committed the enumerated common-law

torts of "assault, battery, false arrest, and false imprisonment[,] [and] also deprived [Mr.

Monarque] of his constitutional rights under the state and federal constitutions."  (Doc. 12 at 19).

She further contends that Boone's negligent training and supervision of the officers renders him

liable in a supervisory capacity, and that the City of Rio Rancho and the RRPD are also liable for

the officers' constitutional violations under the doctrine of respondeat superior.

**A.  Common Law Tort Claims Against All Defendants**

Plaintiff does not set forth the elements of any of the common-law torts – assault, battery,

false arrest, or false imprisonment – of which she accuses Defendants, let alone establish how

Defendants are liable for them.  The Court will not set out Plaintiff's theory of the case for her

by combing through her factual allegations to determine which facts potentially support which

claims.  *See Bacchus*, 939 F.2d at 891 ("The party opposing the motion [for summary judgment]

must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.").  Thus, Defendants are entitled to summary judgment on the portion of Plaintiff's NMTCA claims that allege violations of assault, battery, false arrest, and false imprisonment.

**B.  Excessive Force Claim Against Jones, Garcia, and Maldonado**

As discussed above, Plaintiff has established a genuine dispute of material fact regarding whether Sergeant Jones and Officers Garcia and Maldonado violated Mr. Monarque's Fourth Amendment right to freedom from excessive force.  Plaintiff asserts that the officers are additionally liable under the NMTCA for the same constitutional violation.  The law is clear that a plaintiff may bring a claim under the NMTCA based on the same underlying conduct as a claim brought pursuant to § 1983.  *See Wells v. County of Valencia*, 98 N.M. 3, 11 (N.M. 1982) ("The [NMTCA] does not prohibit a plaintiff from bringing an action for damages under the [NMTCA] where the plaintiff also pursues, by reason of the same occurrence, an action against the same government under 42 U.S.C. § 1983") (plaintiff permitted to press suit for damages for cruel and unusual punishment under § 1983 and the NMTCA).  Thus, for the same reasons that the Court found that the officers are not entitled to qualified immunity under §1983, the Court denies summary judgment to the officers on Plaintiff's claim under the NMTCA.

**C.  Excessive Force Claim Against Boone**

Next, Plaintiff claims that Chief Boone is liable under the NMTCA under a theory of supervisory liability, on the argument that his negligent training and supervision of Jones, Garcia, and Maldonado proximately caused Mr. Monarque's death.  Unlike the federal remedy provided by § 1983, the NMTCA waives immunity from liability for supervisory law enforcement officers whose negligent training or supervision of their subordinates was a proximate cause of one of the torts specified at Section 41-4-12.  *See Ortiz v. New Mexico State*

18

*Police*, 112 N.M. 249, 251 (N.M. Ct. App. 1991) ("[i]t suffices that the law enforcement officer, while acting within the scope of duty, negligently or intentionally causes the commission of a listed tort by another person."); *see also Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dept.,* 121 N.M. 646, 653 (N.M. 1996).  "[I]mmunity is not waived for negligent training and supervision standing alone; such negligence must cause a specified tort or violation of rights." *McDermitt v. Corrections Corp. of America*, 112 N.M. 247, 248 (N.M. Ct. App. 1991).  Plaintiff concedes that she has not set forth evidence that, if believed, would establish that Boone was negligent in the training and supervision of his subordinate officers.  She contends, however, that she should be allowed adequate discovery to enhance her claim.

The Court agrees that it would be inappropriate to grant summary judgment to Boone on Plaintiff's NMTCA claim without affording Plaintiff the benefit of additional discovery.[3]  As noted above, on May 20, 2011, Magistrate Judge Molzen entered a stay of all discovery in this case pending resolution of Defendants' motion for summary judgment based on qualified immunity.  *See supra* at 4.  Thus, Plaintiff has not yet had the opportunity to develop those of her claims to which qualified immunity is not a defense.  The Court finds that Plaintiff's claim that Boone failed to properly train and supervise his subordinate officers, if supported by evidence obtainable on discovery, would create a genuine dispute of material fact as to whether he violated the NMTCA.  Thus, the Court will deny summary judgment on the instant claim without prejudice.  If, after Plaintiff has had sufficient opportunity to take discovery targeted to enhance her factual allegations with respect to Boone's conduct, Defendants still wish to move

---

[3]Plaintiff has previously obtained police reports and related materials from the Rio Rancho Police Department Records Custodian under the Inspection of Public Records Act ("IPRA").  (Doc. 30).

for summary judgment on this claim, they will be permitted to refile their motion.

**D. Excessive Force Claim Against the City and the RRPD**

Finally, Plaintiff argues that the two municipal Defendants – the City and the RRPD – are also liable under the doctrine of respondeat superior for their employees' violations of the NMTCA.  The NMTCA clearly permits suits against both law enforcement officers and their government employers.  *See* Section 41-4-19(A) (stating that "[i]n any action for damages against a <u>governmental entity</u> or public employee," the liability shall not exceed the stated amounts) (emphasis added).  Moreover, Plaintiff is correct that she can bring an action under the NMTCA against any "governmental entity who has the right to control the employee's conduct under a theory of respondeat superior."  *Lopez v. Las Cruces Police Dept.*, 139 N.M. 730, 735 (N.M. Ct. App. 2006).  *See also Quezada v. County of Bernalillo*, 944 F.2d 710, 720 (10th Cir. 1991) ("[i]n New Mexico, a governmental entity is not immune from liability for any tort of its employee acting within the course of duties for which immunity is waived.") (quotation and marks omitted).

The Court finds that Plaintiff has set forth sufficient evidence that the City and the RRPD are liable under the NMTCA for the constitutional violations of their employee officers. The doctrine of respondeat superior is not limited to imposing vicarious liability under the NMTCA against an employee's *immediate* supervisor. According to the  New Mexico Supreme Court, "adherence to a principle of 'direct supervision' should never be used to defeat totally a claim which otherwise has been brought under traditional concepts of respondeat superior." *Silva v. State of New Mexico,* 745 P.2d 380, 385 (N.M. 1987) (state and state corrections department could be named as defendants in suit brought under the NMTCA alleging that officers' negligent failure to provide care to a prisoner resulted in prisoner's suicide).  Thus, the

20

Court will deny summary judgment on Plaintiff's NMTCA claim against the two municipal

Defendants.

IV.     **Plaintiff's Claims Against All Defendants Under § 504 of the Rehabilitation Act**

Finally, Plaintiff argues that Defendants violated Mr. Monarque's rights under  § 504 of

the Rehabilitation Act, which provides that

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program
> receiving Federal financial assistance. . . .

29 U.S.C. § 794(a).  For purposes of this motion, Defendants do not dispute that qualified

disabled individuals can state a claim under the Act based on police conduct during an arrest.[4]

They argue, however, that Plaintiff's claim fails because she has not shown that Mr. Monarque

was disabled within the meaning of the Act at the time of his handcuffing and detention.

To establish a *prima facie* case of discrimination under the Rehabilitation Act, a plaintiff

must show that (1) he is a qualified individual with a disability; (2) he was "denied the benefits

of some public entity's services, programs, or activities, or was otherwise discriminated against

by the public entity"; and (3) the discrimination was on account of his disability.  *Gohier,* 186

_____

[4] The Tenth Circuit has thus far only observed that *other* Circuits have recognized claims
for disability discrimination where a plaintiff alleges that a police officer "failed to reasonably
accommodate [his] disability" in the process of arresting him.  *Gohier v. Enright*, 186 F.3d 1216,
1220-21 (10th Cir. 1999) (citing *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998)).  Other courts
of this Circuit have read the court's survey of out-of-circuit case law in *Gohier* to predict that the
Tenth Circuit would likewise "recognize a failure-to-reasonably-accommodate theory during an
arrest."  *Ulibarri v. City & County of Denver,* 742 F. Supp. 2d 1192, 1213 (D. Colo. 2010); *see
also Twitchell v. Hutton*, 2011 U.S. Dist. LEXIS 8474, at * 28-*30 (D. Colo., Jan. 28, 2011).
For purposes of considering the instant motion for summary judgment, this Court will do the
same.

F.3d at 1219.

**A.      Whether Monarque was Disabled or Regarded as Such**

The Rehabilitation Act adopts the definition of disability set forth in the Americans With

Disabilities Act ("ADA"), which holds an individual disabled if he (1) has a physical or mental

impairment that substantially limits[5] one or more major life activities;[6] (2) has a record of having

such an impairment; or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(2).

Accordingly, a claim of disability discrimination may be based on the contention that the

plaintiff was merely regarded as disabled, i.e., that an entity receiving federal funding mistakenly

believed either (1) that the plaintiff had an impairment that substantially limited a major life

activity when the plaintiff had no such impairment or (2) that an actually-existing impairment

substantially limited a major life activity when the impairment was not so disabling.  *Detterline*

*v. Salazar*, 320 Fed. Appx. 853, 856 (10th Cir. 2009).

Plaintiff does not proffer any evidence that Mr. Monarque was disabled under the Act.

Rather, she alleges conclusively that the three responding officers "were acutely aware of Mr.

Monarque's disabilities – to wit, an obvious psychological disability, coupled with extreme

---

[5]For a disability to be "substantially limiting" the individual must be: "(i) Unable to
perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which the individual
can perform a particular major life activity as compared to the condition, manner, or duration
under which the average person in the general population can perform that same major life
activity."  *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 611 n.11 (10th Cir. 1998) (quoting 29
C.F.R. § 1630.2(j)(1)).

[6]The Tenth Circuit has defined  "major life activities" to "include such functions as
caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,
learning, sleeping, sitting,  standing, lifting, reaching, and working."  *Rakity v. Dillon
Companies, Inc.*, 302 F.3d 1152, 1158 (10th Cir. 2002) (quotation omitted).

obesity." (Doc. 12 at 21). There is no evidence in the record, however, that Mr. Monarque suffered from a natural psychological condition. Moreover, the incomplete excerpt of the OMI report entered in the record by Plaintiff does not contain any reference to the presence of narcotics in Mr. Monarque's system at the time of death or to his alleged "extreme obesity."

There is evidence, however, that one of the officers on the scene regarded Mr. Monarque as potentially suffering from a "mental impairment that substantially limit[ed] . . .major life activities," based on that officer's own representations. The term "individual with a disability" expressly excludes "an individual who is currently engaging in the illegal use of drugs" under the Rehabilitation Act. *See* 29 U.S.C. § 705(20)(C)(I); *see also Nielsen,* 162 F.3d at 610 n.10. However, the record shows that Officer Garcia regarded it as equally likely that Mr. Monarque was suffering from a naturally-occurring mental impairment. *See* Doc. 12 Ex. 3 (Garcia stating in his report that "it was apparent, from my training and experience, that [Mr. Monarque] was on some type of narcotic *or that he had some type of psychological condition*") (emphasis added); *cf.* Doc. 12 Ex. 8 (Officer Waldrep stating only that he regarded Mr. Monarque as "under the influence of some kind of narcotic"). Thus, the Court finds that there is sufficient evidence to show that Officer Garcia regarded Mr. Monarque as suffering from a mental impairment that substantially limited him in his performance of major life activities.

**B.      Whether Officer Garcia Possessed Discriminatory Intent**

Defendants contend that even if Plaintiff meets the first prong of a *prima facie* claim for violation of the Rehabilitation Act, she cannot demonstrate that Defendants discriminated against Mr. Monarque on account of his perceived disability. Because the record shows that only Officer Garcia held a belief that Mr. Monarque was disabled (or, at least, a belief that Mr. Monarque was as likely to be suffering from a mental disability as he was to be under the

23

influence of a controlled substance) at the time of his arrest, the Court will limit its analysis to Officer Garcia's conduct.

In order for Plaintiff to prevail on a claim of disability discrimination based on the theory that Garcia failed to reasonably accommodate her brother's disability in the course of arrest, she must allege facts that, if proven, would show that Garcia intentionally caused Mr. Monarque to "suffer greater injury or indignity in that process than other arrestees." *Gohier,* 186 F.3d at 1220-21; *see also Ulibarri,* 742 F.Supp.2d at 1213.  Plaintiff has not alleged facts which, if credited by a jury, could support such a claim.  By her own version of events, Garcia was acting on the direction of his superior officer, Sergeant Jones – who Plaintiff has not shown regarded Mr. Monarque as disabled – when he employed the restraints alleged.  Accordingly, Plaintiff fails to articulate a theory of how Officer Garcia intentionally caused Mr. Monarque to suffer a greater injury or indignity than a non-disabled arrestee would have experienced in the same circumstances.  Thus, the Court concludes that there is no genuine issue of material fact that Mr. Monarque did not suffer discriminatory injury or indignity during his arrest because of his disability.  Therefore, Defendants' motion for summary judgment on Plaintiff's claim under the Rehabilitation Act will be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, it is therefore ordered that Defendants' *Motion for Summary Judgment Based on Qualified Immunity, Dismissal of All Remaining Claims, and Request for Stay* (Doc. 9) is granted in part and denied in part as follows:

1.     As to Plaintiff's constitutional claim for excessive force against Defendants Garcia, Maldonado, and Jones pursuant to 42 U.S.C. § 1983, Defendants' motion is **DENIED.**

2.      As to Plaintiff's claim for supervisory liability against Defendant Boone pursuant to 42 U.S.C. § 1983, Defendants' motion is **GRANTED.**

3.      As to Plaintiff's claim for violation of the New Mexico Tort Claims Act against Defendants Garcia, Maldonado, and Jones, Defendants' motion is **DENIED.**

4.      As to Plaintiff's claim for violation of the New Mexico Tort Claims Act against Defendant Boone, Defendants' motion is **DENIED without prejudice.**

5.      As to Plaintiff's claim for violation of the New Mexico Tort Claims Act against the City of Rio Rancho and the RRPD, Defendants' motion is **DENIED**.

6.      As to Plaintiff's claim for violation of § 504 of the Rehabilitation Act against all Defendants, Defendants' motion is **GRANTED.**

**DATED** this 23rd day of January, 2012.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorneys for Plaintiff:
Brendan K. Egan
Carolyn M. Nichols
Daniel Philip Estes
Jason M. Alarid

Attorneys for Defendants:
James P. Lyle